UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | *Criminal No. 05-99-P-H* |
| | ) | |
| CHARLES PARKS, | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Charles Parks, charged with theft of firearms from a federally licensed firearms dealer in Brunswick, Maine in violation of 18 U.S.C. §§ 922(u) and 924(m), seeks to suppress evidence obtained following his arrest in the State of New York on October 20, 2005. *See* Indictment (Docket No. 1); Defendant's Motion To Suppress Evidence ("Motion To Suppress") (Docket No. 19). An evidentiary hearing was held before me on August 4, 2006 at which the defendant appeared with counsel. Following the close of evidence I offered counsel an opportunity to argue orally, and defense counsel availed himself of that offer. With the benefit of the motion papers and oral argument, and based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

**I. Proposed Findings of Fact**

At about 6:15 p.m. on October 18, 2005, New York State Police ("NYSP") Investigator Edward Marecek was in the midst of an investigation at a NYSP substation in Sylvan Beach, a neighborhood within the Town of Vienna, New York, when he heard radio traffic from an Oneida

County dispatcher indicating that a forcible robbery had just transpired at Ray's Gun Shop ("Ray's") in Sylvan Beach. The dispatcher described the robbery suspect, whose getaway route was unknown, as about 19 to 21 years old, approximately 5 feet 7 inches to 5 feet 9 inches tall, wearing a gray sweatshirt and jeans and having light-colored hair. Marecek drove to Ray's, taking a circuitous route to see whether he could spot anything unusual. He saw a young woman standing in her driveway, stopped his car and briefly questioned her. The woman, Samantha Voles, reported that she had seen another young woman whom she recognized as Christina Hubbard, and Hubbard's boyfriend, traveling southbound on Vienna Road (the street on which Ray's is located) at about 5:45 or 6 p.m. She described Hubbard's boyfriend as wearing a camel-colored sweatshirt and carrying a backpack.

    Marecek proceeded to Ray's, which is housed in a converted garage attached to the home of the proprietor, Raymond Umber. There he found several police officers on the scene and observed that a glass case in back of the store had been smashed out and a cash register on top of the case was open. He was informed that Umber, who had been assaulted during the robbery, had been taken by ambulance to a hospital in Utica, New York. The Ray's robbery and assault were publicized in newspapers, on television and via radio. Marecek took on the role of lead investigator with respect to the crime, ultimately working with at least two dozen law-enforcement officers from the NYSP, the Oneida County Sheriff's Department and the Rome (New York) Police Department ("Rome PD") prior to the defendant's arrest on October 20, 2005.

    On the night of the robbery, Marecek tasked two NYSP officers, Troopers Usmail and Dix, to interview Hubbard.[1] They did so that evening. Hubbard told them that she and her boyfriend, Thomas Pultuinovich, had been riding their bikes back to her home on Vienna Road (near Ray's). Pultuinovich

---

[1] Marecek did not supply the first names of Troopers Usmail or Dix.

was known to the law-enforcement community, having been arrested many times in the past. Pultuinovich's criminal history, combined with his presence near Ray's and the report that he was wearing a sweatshirt, raised suspicion. However, after Usmail and Dix also interviewed Pultuinovich that evening, they reported to Marecek that there was no evidence he had been at Ray's, he had a valid alibi, and he did not physically fit the description of the robber. That evening a third NYSP investigator, Alan Svitak, interviewed Umber at the hospital. Marecek and Marecek's boss, Senior Investigator Ken Dence, also personally interviewed Umber at the hospital the following day (October 19).

Umber told Svitak, Marecek and Dence that the individual who robbed and assaulted him on October 18 had come to the store the previous day. Umber had informed him that the store was closed and that he would have to come back the next day. The individual mentioned to Umber that he was from Blossvale (another neighborhood within the Town of Vienna, near Sylvan Beach). The individual returned to Ray's the next day at about 6 or 6:15 p.m. He asked Umber to show him various types of ammunition, and Umber told him where it was. The individual picked up a canister of .22-caliber ammunition and inquired about its price. Umber answered and turned his back. When Umber again turned to face the individual, the individual began striking him in the face with the canister, knocking him to the ground. As he lay on the floor, Umber heard glass shattering and realized guns were being stolen. Umber described his assailant as a stocky man wearing jeans and a gray sweatshirt with its hood up, having light-colored hair and a goatee, about 5 feet 7 to 5 feet 9 inches tall and 19 to 21 years old. Umber thought that five guns had been stolen; Marecek and Dence later returned to Ray's, took an inventory and determined that twelve had been stolen.

On the night of the robbery, while Svitak was interviewing Umber, Marecek and others conducted "area canvasses," interviewing people within the vicinity of Ray's. Those interviewed

3

included Loretta and Randy Case, who lived across the street from the shop. The Cases told Marecek that at approximately 6:15 p.m. they had observed Umber's wife Donna and a person they thought was Umber running in and out of the store. Marecek later determined this was not Umber, who at that time was unable to move from the floor, but rather another neighbor who had come to the Umbers' aid. The Cases also told Marecek that on the previous day, October 17, between noon and 1 p.m., they had observed an individual talking to Umber who had light-colored hair, was wearing a gray sweatshirt and was carrying a backpack.

After Marecek finished his work at the scene of the robbery that evening, he returned to his office at the headquarters of NYSP Troop D in Oneida, New York. There he met with another NYSP investigator with whom he frequently worked, Christopher Altimonda. After hearing details of the case, Altimonda remarked that he thought an individual named Charles Parks, who had been involved in other gun-related and home-invasion cases, fit the description of the robber. The following morning Marecek obtained computer-database information about Parks. He learned that Parks had been charged with at least one crime, a burglary, when he was 16 or 17 years old. He determined that although Parks' facial hair varied, his height, age and hair color matched those of the robber as described by Umber. Parks was then 19 years old. *See* Gov't Exh. 3. Two NYSP investigators, Rich Dix and Mark Nell, went to the home of Parks' father, Michael Parks, Sr. ("Parks, Sr."), whom they interviewed that day. Parks, Sr. told them that he had not heard from Charles Parks, who resided in a mobile home on Teelin Road in Blossvale owned by Parks, Sr., for four days, although Parks, Sr.'s Caller ID indicated that Charles had tried to reach him by cell phone on October 17. Parks, Sr. gave the investigators that cell-phone number.

Dix and Nell relayed this information to Marecek, who traveled to the blue mobile home on Teelin Road described by Parks, Sr. There, Marecek spoke with an individual who identified himself

as Darryl Rude, Parks' cousin. Rude said that he lived in the mobile home with Charles Parks and Michael Parks, Jr., that he had not seen Charles in a while and that he did not know where he was.

Also on the morning of October 19, Marecek was approached by Sergeant Nell, station commander at the Oneida NYSP headquarters, who said that he had taken a phone call that morning from a person who wished to remain anonymous who reported that he had contacted Lieutenant Fayle of the NYSP two days earlier to report that a person named Charles Parks had approached some of the caller's relatives in Blossvale to attempt to sell them guns.[2] The caller added that Parks lived in a blue trailer on Teelin Road and that he believed Parks had obtained the guns in Utica, New York. Marecek also was approached on the morning of October 19 by Lieutenant Fayle, who confirmed that on October 17 he had received a call from an individual whom he was having trouble understanding because an operator kept cutting in asking the caller to deposit fifteen cents. Fayle had understood the caller to be saying that a "Charles Clark" was trying to sell guns. Before Fayle could ask any questions, the call ended for non-payment of additional money.

On the afternoon of October 19, at Marecek's direction, NYSP investigator John Fallon brought a photographic array to Umber at the hospital in Utica. The array contained close-ups of the faces of six similar-looking young men with short, light-colored hair, all depicted against a gray-blue background. *See* Gov't Exh. 1. In response to the question, "Do you see anyone you recognize?" Umber answered: "If anyone, Number 2. He closest resembles him." Gov't Exh. 2. Fallon asked, "Resembles who?" and Umber responded: "The man who hit me." *Id*. Umber commented: "He doesn't have a goatee there [as depicted in the photographic array]." *Id*. Photograph No. 2 is a photograph of Parks. Marecek considered this a positive identification. Umber was also shown a

---

[2] Marecek did not supply the first names of Sergeant Nell (assumedly a different person than Investigator Nell) or Lieutenant Fayle.

photographic array that included a photograph of Pultuinovich. He said that the photograph depicting Pultuinovich stood out to him but that the person was not his assailant. Marecek did not consider this a positive identification. Pultuinovich lives within yards of Ray's; thus, Marecek thought Umber might simply have seen him in the neighborhood on previous occasions.

The following day, on October 20, Marecek personally re-interviewed Parks, Sr. Parks, Sr. told him he still had not heard from Charles and believed Charles was with a person named Luke Edick, whose phone number Parks Sr. provided to Marecek. Also that day, NYSP Lieutenant Irwin Brandl received a phone call from a woman named Carol Pitcher, who said she had information from a source she wished to keep anonymous that Charles Parks committed the Sylvan Beach robbery. Marecek's boss, Senior Investigator Dence, who personally knew Pitcher, suspected that Pitcher's daughter Christina Sanford was the anonymous source. He directed Marecek to find and interview Sanford. Investigators located both Sanford and her boyfriend, Ron Wood, and brought them to the Rome PD station. Marecek interviewed Sanford, while Dence and another NYSP investigator, Michael Grande, interviewed Wood separately. Sanford explained to Marecek that she and Wood lived with her mother (Pitcher). She said that earlier that day, she had overheard Wood's end of a phone conversation with George Wishart, Jr. in which Wishart was telling Wood that Parks had shown up at Wishart's house a couple of nights earlier (on October 18) with six to eight handguns. Wood, who was himself known to the law-enforcement community as a previous suspect in various crimes, denied that any such conversation had taken place. Sanford declined to provide a written statement or to give a deposition, stating that she did not wish to be involved. Marecek does not know Sanford personally and has no way to assess her credibility or reliability.

In attempting to locate Parks, the NYSP obtained information that he might be staying in the City of Rome, New York, and enlisted the aid of the Rome PD in the hunt. On the afternoon of

6

October 20, Rome PD Investigator Joseph Rotolo informed Marecek that he had obtained information from a confidential informant ("CI") concerning the location of Parks and at least one handgun. The CI had told Rotolo that on the previous day (October 19) he had observed Parks at the home of Nicole Hobbs on Martin Street in Rome with a silver-colored handgun in his waistband. Marecek did not personally know the CI or whether he/she was reliable, but Rotolo described him/her as reliable. Rotolo requested that, if Marecek questioned Parks, he ask him as well about his possible involvement in other crimes, including an October 7, 2005 theft of firearms from a gun shop in Brunswick, Maine (the subject of the instant indictment). *See* Indictment.

By this time Marecek felt police had probable cause to arrest Parks for the Ray's robbery based on Umber's positive identification of Parks from a photographic array, the fit between the description of the robber and Parks, general knowledge of Parks from past law-enforcement encounters, the anonymous phone calls on October 17 and 19, the information from Christina Sanford and the report of the CI.[3] An Oneida County drug-enforcement task force set up surveillance of the Hobbs residence while Marecek and Rome PD investigators applied for a warrant to search the residence. No one applied for a warrant to arrest Parks; however, the Oneida County District Attorney's Office gave the order for his arrest. At about 5:45 p.m., while waiting at the Rome PD for word whether the search warrant had been granted, Marecek received a call from a task-force member advising him that Parks and a black male had left the Hobbs residence and driven away in a Ford Ranger pickup truck. Task-force members followed the vehicle, which was headed toward Marcy,

---

[3] At some point – it is unclear exactly when – Marecek learned from the Rome PD that in executing a search warrant at a Rome residence prior to the Ray's robbery Rome police officers seized a handgun that they ultimately traced to Parks. Following seizure of the gun, Rome police officers ran a special file check on it and learned that it had been stolen from a gun shop in Maine. Officers then interviewed the resident whose home had been searched, who told them he got the gun from George Wishart. They then questioned Wishart, who said he had obtained the gun from Charles Parks. During cross-examination, Marecek did not list this information as buttressing probable cause to arrest the defendant; hence, I conclude that he did not know it prior to the defendant's arrest.

7

New York. Marecek and Investigator Dix got into a vehicle and headed toward that location. At Dence's behest, NYSP troopers in a marked patrol car stopped the Ranger and arrested Parks. Within a few minutes, Marecek and Dix arrived at the scene. Marecek observed Parks standing, handcuffed, by the marked patrol car, next to two NYSP troopers. Parks, who was wearing a white T shirt, jeans and sneakers, did not have a goatee, but apart from that, in Marecek's view, he matched the description of the robber given by both Umber and the Cases: He was about 5 feet 6 or 5 feet 7 inches tall and had light-colored hair and somewhat of a stocky build.[4]

Parks was placed in the back of Marecek's and Dix's vehicle and taken to the NYSP station in Marcy, New York. Marecek and Dix took him to a small interview room. Parks told the investigators he could write but could not read well. Marecek read him his *Miranda* rights, pausing to inquire whether he understood each.[5] After Parks indicated he understood each right, Marecek asked him to place his initials alongside it, which Parks did. *See* Gov't Exh. 3. Parks then was asked if he agreed to give those rights up and make a statement. He said he did, and signed his name alongside a portion of the *Miranda* form so indicating. *See id.* The time was approximately 6:20 p.m.

The interview commenced. Parks was very cooperative, was not agitated and spoke in a normal tone of voice. He did not appear to Marecek to be under the influence of drugs. He told investigators he was tired but was sober and had not had any crack cocaine to smoke in a while. The tone of the interview was cordial and businesslike. Parks initially denied any knowledge of the Ray's

---

[4] At some point on October 20, a Rome city judge did grant the warrant to search the Hobbs home. In New York, there is a procedure whereby confidential informants can be brought before a magistrate, without compromising their identity, for purposes of permitting the magistrate to assess those informants' credibility in deciding whether to issue a warrant. The CI upon whom Rotolo relied was in fact brought before a Rome city judge on October 20, and the judge issued the warrant. However, no evidence was adduced at hearing that Marecek or the arresting officers were aware that the warrant had been issued as of the time of Parks' arrest.
[5] Per *Miranda v. Arizona,* 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at
*(continued on next page)*

robbery. The conversation then turned to Parks' personal life. He told Marecek and Dix that he used to be bigger and stronger and was a weight lifter, but that he had started using drugs and lost bulk as a result. The topic turned to Parks' family members. Dix remarked that, from interviewing various people, he had learned that the one constant in Parks' life appeared to be his mother inasmuch as she was the only person who would help him in any circumstance and give him unconditional love. Parks broke down crying. Approximately forty-five minutes had elapsed since the interview began. The investigators again asked Parks about the robbery of Ray's. This time he confessed, stating that he had begun beating Umber, stolen the guns and taken cash from the register after Umber upset him by being rude and disrespectful to him.[6]

Marecek and Dix then questioned Parks about his possible involvement in other crimes, including the theft of guns from a sporting-goods store in Maine. Parks confessed to the Maine gun theft, stating that he had been working in Maine for George Wishart, Sr., the father of George Wishart, Jr., and staying in a hotel next to a gun shop in a "dead town." When the shop was closed, he kicked in the front door, went in, stole eight handguns, stuffed them in a green duffel bag, loaded them into Wishart's vehicle and returned to New York with them.

After the interview concluded, Marecek and Dix provided Parks with food and an opportunity for a cigarette break. Marecek then typed up Parks' written statement in Dix's presence, with Parks sitting, unhandcuffed, at a desk next to him. Marecek again asked Parks questions and typed up what he said. Dix read the finished document aloud to Parks, who signed it and dated it at 10:07 p.m. *See id.* Consistent with Marecek's customary practice, he took no notes of the interview and did not

---
478-79.

[6] On cross-examination, Marecek admitted that he and Dix were attempting to find a subject close to Parks that might affect him and help them extract information from him.

audiotape or videotape it.

## II. Discussion

The defendant seeks to suppress evidence on the bases that (i) the NYSP lacked probable cause to arrest him on October 20, 2005, and (ii) his statements to Marecek and Dix at the Marcy police station subsequent to his arrest were involuntary. *See generally* Motion To Suppress.[7] With respect to both points, the government bears the burden of demonstrating the lawfulness of the challenged conduct. *See, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992) (warrantless search or seizure); *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990) (voluntariness of confession). For the reasons that follow, I find that the government carries its burden of proof with respect to both issues, as a result of which I recommend denial of the Motion To Suppress.

### 1. Arrest

As the First Circuit recently has reiterated:

> Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime. The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) (citations and internal punctuation omitted).

---

[7] The defendant also initially questioned whether police possessed reasonable articulable suspicion to effectuate a so-called "*Terry* stop." *See* Motion To Suppress at [2] (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). However, the government rejoined that it could meet the more exacting standard of showing probable cause to arrest the defendant at the time of the vehicle stop (thus obviating the need for a separate *Terry*-stop analysis). *See* Government's Objection to Defendant's Motion To Suppress, etc. (Docket No. 21) at 4-5 & n.3.

An officer's determination that a crime has been committed need not be "ironclad" or even "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause. *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999); *see also, e.g., Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 255 (1st Cir. 1996) ("[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").

At hearing, defense counsel argued that police lacked probable cause to effectuate the warrantless arrest of his client on October 20, 2005 for the Ray's robbery, asserting that:

1. Umber's identification of the defendant from the photographic array shown him was not "positive" but, rather, equivocal.

2. Other information on which Marecek relied concerned the defendant's possession of weapons or his location but did not implicate him in the robbery of Ray's.

3. The anonymous phone calls upon which Marecek relied were vague and/or unreliable in and of themselves.

4. Sanford's information was unreliable hearsay that she was unwilling to put in writing and that Wood, who had first-hand knowledge of the conversation, denied. In any event, Sanford had no information specifically about the Ray's robbery.

5. The CI provided no information about the Ray's robbery.

These arguments notwithstanding, the government easily vaults the hurdle of demonstrating that the collection of puzzle pieces Marecek and other law-enforcement officers managed to gather in the two days following the Ray's robbery, via dogged, methodical detective work and some lucky breaks, fit together sufficiently well to point to the defendant as the likely perpetrator of that crime.

First and foremost, the police had powerful evidence in the form of an identification by Umber that fairly can be characterized as "positive." Umber had seen and spoken face-to-face with his assailant on two occasions two days in a row; he thus had ample opportunity to observe him. From an array of photographs of six strikingly similar-looking youths, Umber identified the defendant as most closely resembling his assailant despite the defendant's lack of facial hair in the photograph. To the extent this puzzle piece, in itself, left doubt that the defendant likely was the perpetrator, police gathered other bits and pieces of information tending to shore up that conclusion. Some of this collateral evidence, standing alone, would not have been particularly probative or compelling; however, when placed in the mix of the totality of the circumstances, it tended to buttress the bottom-line conclusion. These bits and pieces included:

1. Umber's recollection that the robber had told him he was from Blossvale. Marecek learned from Parks, Sr., and confirmed from Rude, that the defendant lived in Blossvale.

2. The independent eyewitness account of the Cases – corroborating Umber's story – in which they described seeing Umber speak on October 17 to an individual with light-colored hair who was wearing a gray sweatshirt and carrying a backpack. Reports by disinterested, ordinary citizens enjoy "special stature" and have "particular value in the probable cause equation." *United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir. 1996).

3. The anonymous report on October 17 to Lieutenant Fayle and on October 19 to Sergeant Nell that "Charles Parks" (whom Fayle misunderstood to be "Charles Clark") had attempted to sell guns to the anonymous caller's relatives. While the guns in question obviously were not those stolen from Ray's on October 18, the association between the defendant and the sale of handguns bore indirectly on the crime at Ray's, tending to suggest that the defendant was a person interested in guns and illegally trafficking in them. The fact that the caller wished to remain anonymous did not in itself

undermine the validity of his/her information. From all appearances, the caller was an ordinary citizen with no ax to grind who had felt strongly enough about the matter to call twice (both before and after the well-publicized Ray's robbery). Moreover, Marecek obtained information from at least two other sources (Christina Sanford and the CI) that the defendant possessed guns. "Courts often have held that consistency between the reports of two independent informants helps to validate both accounts." *Id*.

    4.    The defendant's criminal history (which included a previous charge of burglary) and Altimonda's report that he was known to law enforcement through involvement in other gun-related and home-invasion cases. While, again, this information proved nothing directly about the Ray's robbery, it tended to suggest that the defendant was a person willing and able to commit a crime of that nature; in other words, it tended to make it more, rather than less, likely that Umber's identification of the defendant as his assailant was accurate.

    5.    Sanford's report that from overhearing Wood talking on the phone on October 20 to George Wishart, Jr., she gathered that the defendant had shown up at Wishart's home two nights earlier (the day of the Ray's robbery) with six to eight handguns. Marecek freely admitted that he did not know Sanford and had no way to assess her credibility or reliability. Further, Sanford declined to give a written statement, and Wood, who purportedly actually engaged in the conversation, denied having had it. Nonetheless, in the circumstances, police justifiably could have chosen to credit Sanford's information. Significantly, Sanford herself never volunteered her story; rather, her mother made a report to police based on a source she wished to keep anonymous (her daughter). Both the mother's and the daughter's reluctance to involve the daughter reasonably could be viewed as enhancing, rather than detracting from, the daughter's credibility. Wood's denial likewise was explicable: He himself had a criminal history and thus an incentive to distance himself from

13

knowledge of the Ray's robbery. Finally, police had elicited or been provided information from several independent sources that the defendant was in possession of one or more guns. These stories tended to cross-corroborate one another. Sanford's report, finally, implicated the defendant at least indirectly in the Ray's robbery: The defendant was said to have shown up at the house of an acquaintance on the night of the robbery with six to eight handguns.

6. Information indicating that the defendant had fled or gone into hiding. As of October 19, Parks, Sr. had not heard from him in four days and did not know his whereabouts; the defendant's cousin and housemate reported that he had not seen him in a while and did not know where he could be found; and finally the CI told Rotolo he had seen the defendant (with gun in waistband) in a home in Rome, New York, on the evening of October 19. While Marecek did not personally know anything about the CI's reliability, Rotolo did, and Rotolo told Marecek the CI was reliable. By virtue of the "fellow officer" rule, Rotolo's knowledge could be imputed to the team working to solve the Ray's robbery and arrest the perpetrator. *See United States v. Meade*, 110 F.3d 190, 194 (1st Cir. 1997) ("The fellow officer rule underlies the well-worn maxim that the collective knowledge and information of all the officers involved establishes probable cause for the arrest. The 'collective knowledge' or 'pooled knowledge' principle has been used to validate arrests in two ways: (1) by tracing the arresting officer's action back to an *individual* in a law enforcement agency who possessed information sufficient to establish probable cause, and (2) by finding that the directing *agency* as a whole possessed the necessary facts.") (citations and internal quotation marks omitted) (emphasis in original).

In short, the conclusion of Marecek (and others working on the Ray's robbery case) that the defendant likely had committed that crime was reasonable based on the collectivity of puzzle pieces gathered. That sufficed to establish probable cause for the defendant's arrest. Accordingly, I

recommend that the defendant's motion to suppress evidence on the basis of lack of probable cause for his arrest be denied.

### 2. Challenge to Voluntariness of Confession

I turn to the defendant's second and final basis for suppression: that his confession was made involuntarily. *See* Motion To Suppress at [3]. When a defendant seeks to suppress statements on this basis, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore the defendant's will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986); *see also, e.g., United States v. Bezanson-Perkins*, 390 F.3d 34, 40 (1st Cir. 2004) ("There are surely situations in which statements made after a valid *Miranda* waiver are subject to suppression, for a number of reasons. For example, police may not get a *Miranda* waiver and then beat a confession out of a suspect and hope to have the confession admitted into evidence. Such a confession would be procured by coercive tactics. Nor may police, against the suspect's wishes, induce intoxication or a drugged state such that any further statement by the suspect is coerced.") (citations omitted); *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

Following the close of evidence, defense counsel volunteered that, on the record made, the argument that his client's will was overborne was tough to make; however, he declined to withdraw it. When I specifically asked whether he contended that Dix's and Marecek's reference to the defendant's family and mother, which produced a tender response, amounted to coercion, he said he did not. Pressed to explain the basis on which the court might find coercion, he pointed to the absence

15

of any notes, videotape or audiotape evidencing the content of the investigators' interview of the defendant apart from that portion containing the defendant's confession. This absence, he said, struck him as suspicious: One could not know what actually transpired in the non-confession portions of the interview.

    I am mindful that, inasmuch as the defendant has raised (and declined to withdraw) an issue concerning the voluntariness of his confession, the burden is on the government to prove his confession was not coerced. The government meets that burden. After the defendant was arrested and taken to the Marcy NYSP station, investigators Dix and Marecek interviewed him in a businesslike and cordial fashion. There is no evidence that the defendant was threatened, maltreated, or arrived at the station in a vulnerable state that the investigators sought to exploit to extract a confession. The only evidence adduced at hearing even arguably suggestive of coercion (and by this I do not mean to suggest that it actually constituted coercion) was that Dix and Marecek were successful in obtaining a confession to the Ray's robbery only after they turned the conversation to the defendant's family and mother, whereupon the defendant (then age 19) broke down crying. However, at hearing, defense counsel disclaimed reliance on that evidence. I conclude, in any event, that the investigators did not break or overbear the defendant's will by their role in the colloquy regarding his family and mother in particular.

    Accordingly, I recommend that the defendant's motion to suppress evidence on the basis that his confession was involuntary be denied.[8]

---

[8] The mere fact that, per his customary practice, Marecek did not take notes of, or videotape or audiotape, his and Dix's interview of the defendant raises no suspicion of coercion. Marecek, in essence, filled in those "blanks" at hearing, relaying in some detail the content of the interview with the defendant (including those portions not reflected in the defendant's written statement). Marecek was a highly credible witness. There is no reason to believe something transpired other than what Marecek described.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 9th day of August, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge